UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Kamal Mehrotra, an individual

    Plaintiff,

vs.

Xcel Energy, Inc., Northern States Power Company—Minnesota,

    Defendants.

Court File No. 11cv 1368 (PJS/RAU)

**COMPLAINT AND JURY TRIAL DEMAND**

## THE PARTIES

1. Plaintiff Kamal Mehrotra ("Plaintiff") is a U.S. Citizen and a resident of Virginia, his sole domicile. He holds a Masters of Civil Engineering Degree from the University of Virginia, and for more than 25 years he has earned his living working on nuclear and industrial projects. Plaintiff is a citizen of Virginia for purposes of diversity jurisdiction.

2. Defendant Xcel Energy, Inc. ("Xcel") is a Minnesota Corporation. It maintains corporate offices in Minneapolis and is a citizen of Minnesota for purposes of diversity jurisdiction.

3. Defendant Northern States Power Company—Minnesota ("NSP") is a Minnesota Corporation, and a wholly-owned operating subsidiary of Defendant Xcel. Defendant NSP owns the Monticello Nuclear Generating Plant ("MNGP"), located in Monticello, Minnesota. Defendant NSP operates the MNGP as a licensee of the United States Nuclear Regulatory Commission ("NRC"). Defendant NSP maintains corporate offices in Minneapolis and is a citizen of Minnesota for purposes of diversity jurisdiction.

SCANNED
MAY 2 7 2011
U.S. DISTRICT COURT MPLS

## NATURE OF ACTION

4. By this action, as further detailed below, Plaintiff seeks recovery against Defendants for defamation (Count I) and negligence (Count II).

## JURISDICTION AND VENUE

5. This Court has "diversity" subject matter jurisdiction over this action pursuant to 28 USC § 1332: citizenship between the parties is diverse and the amount in controversy exceeds $75,000.00, exclusive of interests and costs. This Court has personal jurisdiction over Defendants because they reside in Minnesota and regularly transact business in this judicial district. Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2): Defendants reside in this judicial district, and a substantial part of the events giving rise to Plaintiff's claims occurred within this judicial district.

## BACKGROUND

6. Prior to the events giving rise to this lawsuit, over many years, Plaintiff regularly worked as an engineer at nuclear power plants that were licensees of the NRC.

7. In order to work at such nuclear power plants, Plaintiff needs a specific type of security clearance; namely, he has to have "unescorted access authorization" and "unescorted access." Without the requisite security clearance, Plaintiff cannot make a living working at such facilities.

8. Licensees of the NRC (including Defendants) rely upon a database known as the Personnel Access Data System ("PADS") to process workers' requests for unescorted access (such as Plaintiff's). Each licensee of the NRC that utilizes PADS is required, among other obligations, to provide accurate and timely information about individuals who have applied for and/or received unescorted access at their plants. If a

licensee of the NRC enters adverse information about an individual into PADS, the individual cannot gain unescorted access to a nuclear power plant.

9. Prior to the events giving rise to this lawsuit, Plaintiff had never been the subject of adverse information in PADS, he had never had any problems gaining unescorted access to a nuclear power plant, and he had never experienced any difficulty finding employment in the nuclear power industry.

10. On or about December 10, 2007, Plaintiff commenced employment at the MNGP (the nuclear power plant owned by Defendant Xcel and operated by Defendant NSP). Plaintiff was working pursuant to a long-term contract between Defendants and Engineering Management Specialists, Inc. (an entity that places highly-skilled workers into positions of employment).

11. During Plaintiff's tenure at the MNGP, Defendants controlled his work assignments and employment conditions.

12. In order to work at the MNGP, Plaintiff had to have unescorted access. Prior to commencing work at the MNGP, he obtained the requisite security clearance without incident, and there was no adverse information about him in PADS. In processing Plaintiff's request for unescorted access, neither Defendant Xcel nor Defendant NSP discovered or developed any potentially disqualifying information regarding Plaintiff or his ability to have unescorted access.

13. At the MNGP, Plaintiff worked approximately 55 hours per week, he performed all work assignments in a skillful and professional manner, and he was involved in no disciplinary or safety incidents. He received no negative feedback about

his work performance, and he was not involved in any alleged misconduct or other impropriety.

14. While Plaintiff worked at the MNGP, Defendants never terminated or threatened to terminate Plaintiff's unescorted access. And, Plaintiff was never involved in an event that would have required Defendants to suspend his unescorted access pending an investigation.

15. On or about May 3, 2009, Defendants informed Engineering Management Specialists, Inc. that there was no further work for Plaintiff at the MNGP. Specifically, they stated: "We currently have no assignments that fit Mr. Kamal Mehrotra's skill set." Upon information and belief, despite Defendants' assertion to the contrary, in May 2009, there were in fact long-term assignments available at the MNGP that fit Plaintiff's skill set. Nonetheless, Plaintiff left to seek employment elsewhere in the nuclear power industry.

16. On or about May 28, 2009, Defendants (without Plaintiff's knowledge or consent) knowingly entered false, adverse information about him into PADS. In particular, Defendants falsely designated Plaintiff as an individual whose unescorted access privileges were subject to "ADMIN DATA" and "ADMIN DATA—NO ACCESS," and they caused this information to be published to other licensees of the NRC through PADS.

17. The terms "ADMIN DATA" and "ADMIN DATA-NO ACCESS" have specific meanings when entered into PADS about an individual. They are adverse remarks that, according to the PADS Operating Manual, "identify a situation in which a worker applies for access and potentially disqualifying information (PDI) is developed,

but the worker quits inprocessing prior to an adjudication of the PDI or to record instances in which a worker, who has a current [unescorted access authorization/unescorted access], is involved in an event that requires the [unescorted access authorization/unescorted access] be suspended pending an investigation."

18. By identifying Plaintiff as an individual whose unescorted access was subject to "ADMIN DATA" and "ADMIN DATA—NO ACCESS," and by entering that information into PADS, Defendants knowingly made and published false information about him. Defendants knew that Plaintiff had received unescorted access to the MNGP without anyone developing potentially disqualifying information (PDI) about him. They also knew that while he worked at the MNGP, Plaintiff was not involved in any event that required (or resulted in) suspension of his unescorted access pending and investigation.

19. After Plaintiff ceased working at the MNGP, he sought to secure employment at other nuclear power plants. In the past, he had no problems quickly finding such employment whenever he sought it. This time around things were different. From June 2009 onwards, Plaintiff was repeatedly rejected for the same types of jobs he had easily secured in the past. Paragraphs 20 and 21, recount just some of the difficulties Plaintiff faced securing employment after leaving the MNGP.

20. Between January 2010 and May 2010, Plaintiff was in the final hiring stages for jobs with at least three nuclear power plants. In each such instance, as soon as the prospective employers reviewed the information about him in PADS, they abruptly ended the hiring process with respect to Plaintiff. Upon information and belief, they

chose not to select Plaintiff because of the false "ADMIN DATA" and "ADMIN DATA—NO ADMISSION" that Defendants had published about him in PADS.

21. In July 2010, Plaintiff was the final candidate for a long-term, lucrative position working at the Nine Mile Point Nuclear Generating Station, in New York ("Nine Mile"). Nine Mile's representative indicated that Nine Mile was prepared to hire Plaintiff, and requested that he provide employment references. For his references, Plaintiff listed only individuals with whom he had worked at the MNGP; both were employees of Defendants. Immediately thereafter, Nine Mile changed its mind about hiring Plaintiff. When he inquired as to why Nine Mile chose not to hire him, Plaintiff was told that it was because he had a "bad reference."

22. Subsequent to losing out on the job at Nine Mile, Plaintiff communicated with Scott Quiggle ("Quiggle"), an employee of Defendants. He asked Quiggle whether he would, if he were in charge of hiring for a position at a nuclear power plant, recommend hiring Plaintiff. Quiggle stated that he "certainly would not."

23. Throughout 2010, Plaintiff continued to seek employment at nuclear power plants. Each time he was inexplicably unsuccessful. Finally, in January 2011, he landed a position working at a nuclear power plant in Florida. In connection with the new position, Plaintiff traveled to Florida for training simultaneous to the completion of a background check. On January 24, 2011, he reported to work at the nuclear plant and learned that he was denied access because of the "ADMIN DATA" and "ADMIN DATA—NO ACCESS" published about him in PADS. Thus, on that day, Plaintiff discovered for the first time that Defendants had, without his knowledge or consent, published false, adverse information about him.

24. On January 27, 2011, after repeated inquiries from the nuclear power plant in Florida, Defendants sent an e-mail to Plaintiff stating that "the admin data was removed yesterday and [the nuclear power plant in Florida] was notified." Immediately thereafter, Plaintiff was permitted unescorted access and commenced working in the nuclear power plant.

## COUNT I — DEFAMATION

25. Plaintiff re-alleges Paragraphs 1-24 as if fully restated herein.

26. As described in further detail above, including but not limited to in Paragraphs 16 to 18, Defendants made false statements about Plaintiff when they wrongly identified him as a person whose unescorted access was subject to "ADMIN DATA" and "ADMIN DATA—NO ACCESS."

27. The false statements that Defendants made about Plaintiff were defamatory because they tended to harm his reputation and lower his standing in the eyes of the community.

28. The false statements that Defendants made about Plaintiff were defamatory *per se* because they involved matters that were incompatible with his business, trade or profession.

29. On or about May 28, 2009, Defendants first published the afore-described false and defamatory statements about Plaintiff to third persons by entering the information into PADS. Between May 28, 2009 and January 2011, Defendants regularly re-published the afore-described false and defamatory statements about Plaintiff through PADS.

30. Defendants failed to exercise the degree of care that a reasonable person would have exercised under the circumstances when they made, published, and re-published the afore-described false and defamatory statements about Plaintiff.

31. Defendants made, published, and re-published the afore-described false and defamatory statements about Plaintiff knowing they were false or with reckless disregard for the truth or falsity of the statements.

32. Defendants made, published, and re-published the afore-described false and defamatory statements about Plaintiff in bad faith, with malice, ill-will, spite, and with the intent to harm Plaintiff.

33. Because Defendants made, published and re-published the afore-described false and defamatory statements about Plaintiff, he has suffered actual harm, including but not limited to the following: lost past and future wages and fringe benefits; lost past and future employment opportunities; past, future, and present damage to his reputation and professional standing; and, emotional distress, shame, and embarrassment. The harm that Plaintiff has suffered exceeds $75,000.00, exclusive of interest and costs.

## COUNT II—NEGLIGENCE

34. Plaintiff re-alleges Paragraphs 1-35 as if fully restated herein.

35. At all times material to this lawsuit, Defendants voluntarily participated in PADS. In so doing, they undertook a duty of care to individuals, including but not limited to Plaintiff. Said duty of care encompassed an obligation on their part to assure that the information they entered into PADS about Plaintiff was accurate. Said duty of care also entailed an obligation on their part to regularly review the information they entered into PADS about Plaintiff and to correct any inaccuracies.

36. When they entered "ADMIN DATA" and "ADMIN DATA—NO ACCESS" about Plaintiff into PADS, Defendants failed to exercise the degree of care that a reasonable person would have exercised under the circumstances. Said adverse information was not accurate, and Defendants had no legitimate reason to believe it was accurate.

37. When they failed to review and correct the inaccurate, adverse information they had entered into PADS about Plaintiff, Defendants failed to exercise the degree of care that a reasonable person would have exercised under the circumstances.

38. The failures of Defendants, as described in Paragraphs 36 and 37, constituted negligence.

39. As a direct, proximate and foreseeable consequence of the negligence of Defendants, Plaintiff has suffered actual harm, including but not limited to the following: lost past and future wages and fringe benefits; lost past and future employment opportunities; past, future, and present damage to his reputation and professional standing; and, emotional distress, shame, and embarrassment. The harm that Plaintiff has suffered exceeds $75,000.00, exclusive of interest and costs.

## JURY TRIAL DEMAND

40. Plaintiff is entitled to a trial by jury with respect to his claims against Defendants, and he hereby demands a trial by jury as to all those issues.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays for Entry of Judgment and an Order providing:

A. That Plaintiff is entitled to recover against Defendants as to all Counts of his Complaint;

B. That Plaintiff is awarded compensatory damages and other allowable damages in the amount established at trial;

C. That Defendants pay legal counsel for Plaintiff their reasonable attorneys' fees and the costs and expenses of this action;

D. That Plaintiff is awarded such other and further legal and equitable relief as may be found appropriate, just and/or equitable, including punitive damages.

RESPECTFULLY SUBMITTED,

MULLER & MULLER, PLLC

Date: May 27, 2011

Andrew P. Muller (No. 32467X)
3109 West 50th Street, No. 362
Minneapolis, MN 55410-2102
Phone: (612) 604-5341
Fax: 1-866-509-4782

JOHN A. KLASSEN, PA

Date: May 27, 2011

John A. Klassen (No. 24434X)
700 Lumber Exchange Building
10 South Fifth Street
Minneapolis, MN 55402
Phone: (612) 204-4533

**ATTORNEYS FOR PLAINTIFF**